# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

JOE HARMON

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　Case No. 11-cv-983

JIM LAMPMAN,

BARRICADE FLASHER SERVICE, INC.,

and

JOHN DOE,

    Defendants.

## COMPLAINT

COMES NOW, Plaintiff Joe Harmon, by his attorneys PETERSON, JOHNSON & MURRAY, S.C., and for his causes of action against Defendants Jim Lampman, Barricade Flasher Service, Inc., and John Doe avers:

### INTRODUCTION

1. This action is brought pursuant to 42 U.S.C. §§ 1981 and 1988 to redress unlawful racial harassment, race discrimination, a racially hostile workplace and retaliation for complaining about racial harassment.

### JURISDICTION AND VENUE

2. This Court is vested with jurisdiction over plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1988 and 28 U.S.C. §§ 1331 and 1343.

1

3. The unlawful practices alleged herein were committed within this judicial district. Venue of this action is vested in this Court pursuant to 28 U.S.C. § 1391.

## THE PARTIES

4. Plaintiff Joe Harmon ("Harmon") is a current employee of Barricade Flasher Service, Inc. He is an African-American.

5. Defendant Barricade Flasher Service, Inc. ("Barricade") is a corporation incorporated under the laws of the State of Wisconsin.

6. Barricade is a white owned company. Dennis Lampman is a part owner and the president; he is white. Tim Lampman is a part owner and the vice-president; he is white.

7. Defendant Jim Lampman ("Lampman") is a part owner and the general manager of Barricade. He is white.

8. Lampman is Harmon's immediate supervisor.

9. John Doe is a current employee of Barricade who goes by the initials "RJ."

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

10. Harmon is fully qualified for his job.

11. At all relevant times, Harmon has performed his job duties satisfactorily.

12. Prior to 2010, Harmon regularly performed work on state-related projects, which required Barricade to pay Harmon prevailing wages.

13. In 2010, a coworker who goes by the initials "RJ," referred to African-Americans as "niggers."

14. Shortly thereafter, Harmon orally complained to Lampman, his immediate supervisor.

15. Neither Lampman nor Barricade conducted an investigation of Harmon's racial harassment complaint.

16. Neither Lampman nor Barricade disciplined "RJ" for his racial harassment.

17. Following Harmon's racial harassment complaint, Lampman discriminated and retaliated against Harmon by denying Harmon work on state-related projects, which resulted in Barricade paying Harmon far less than prevailing wages.

   a. Specifically, Harmon's earning potential went from a maximum of $45 per hour (as required by state-mandated prevailing wages) to a maximum of $8.25 (per Harmon's contract with Barricade).

18. Since Harmon's 2010 racial harassment complaint, Lampman has engaged in racially harassing Harmon and has created a hostile working environment for Harmon by making racist remarks and suggestions against Harmon. Specifically:

   a. Lampman suggested that Harmon was a monkey who would like his banana peels.

   b. Lampman sent the below text message to Harmon:

   

   As shown above, the text message refers to the African-American child as "nigga" and suggests she will grow up to be criminal because she is an African-American.

  c. Lampman has assigned "RJ," Harmon's harasser, to work with Harmon.

  d. Lampman has repeatedly required Harmon to perform work without the help of others.

19. Barricade's white employees regularly use the word "nigger" in the workplace. For example, during a conversation between coworkers about going to a shooting range, Joe Lampman (a coworker) said that they should shoot at "niggers."

20. Barricade has done nothing to prevent the unlawful actions complained of herein. Barricade has taken no remedial steps.

### FIRST CAUSE OF ACTION: RACE DISCRIMINATION, RACIAL HARRASSMENT, AND RACIALLY HOSTILE WORKPLACE UNDER 42 U.S.C. § 1981 AGAINST JIM LAMPMAN

21. Harmon incorporates here all previous paragraphs.

22. 42 U.S.C. § 1981 protects Harmon from race discrimination, racial harassment, and a racially hostile workplace.

23. 42 U.S.C. § 1981 provides that all persons shall have the same right to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

24. Lampman's decision not to conduct an investigation of Harmon's racial harassment complaint was motivated by Lampman's racial animus.

25. Lampman's decision not to discipline "RJ" for racially harassing Harmon was motivated by Lampman's racial animus.

26. Lampman racially harassed Harmon when he sent the text message in paragraph 18(b) to Harmon's cell phone.

27. Lampman's maintained a racially hostile workplace for Harmon by:

  a. Allowing white employees to regularly refer to African-Americans as "niggers" in the workplace.

> b. Sending racist text messages to Harmon.

28. Lampman discriminated against Harmon by denying his requests to work on state-related projects that would have resulted in prevailing wages.

> a. No similarly situated white or non-complaining employee was denied the opportunity to earn prevailing wages.

29. When Lampman discriminated against Harmon because of his race and retaliated against Harmon because he complained of racial harassment, Lampman knew the immediate, practical and tangible materially adverse result would include (without limitation) creating a hostile working environment for Harmon.

30. The unlawful actions of Lampman against Harmon were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Harmon's rights as guaranteed by 42 U.S.C. § 1981.

31. Lampman treated Harmon less favorably and more harshly than Harmon's similarly situated and non-complaining coworkers in the terms, conditions, benefits, and privileges of Harmon's employment because of his race and in retaliation for complaining about racial harassment.

32. Lampman desired to inflict severe emotional distress on Harmon and/or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

33. As a direct, foreseeable, and proximate result of Lampman's intentional illegal discrimination, Harmon has suffered injuries, damages, and other losses, without limitation to lost wages and benefits, anxiety, personal indignity, humiliation,

embarrassment, and emotional distress. These injuries and damages continue into the present and will continue into the foreseeable future.

34. Harmon requests relief as hereinafter provided.

## SECOND CAUSE OF ACTION: RETALIATION
## UNDER 42 U.S.C. § 1981 AGAINST JIM LAMPMAN

35. Harmon incorporates here all previous paragraphs.

36. 42 U.S.C. § 1981 protects Harmon from retaliation for complaining about race discrimination, racial harassment, a racially hostile workplace, and retaliation.

37. Harmon engaged in protected activity when he complained about "RJ's" racial harassment.

38. Lampman retaliated against Harmon for complaining about "RJ's" harassment by:

   a. Refusing to allow Harmon to work on state-related projects that would have paid him prevailing wages.

      1) No similarly situated white or non-complaining employee was denied the opportunity to earn prevailing wages.

   b. Assigning "RJ," Harmon's harasser, to work with Harmon.

   c. Requiring Harmon to perform work without the help of others.

      1) No similarly situated white or non-complaining employee was required to perform work without the help of others.

39. There exists a causal connection between Harmon's protected activities and Lampman's materially adverse action without limitation to the temporal proximity between the date when Harmon complained about "RJ's" racial harassment and the date Lampman began retaliating against Harmon.

40. When Lampman discriminated against Harmon because of his race and retaliated against Harmon because he complained of racial harassment, Lampman knew the immediate, practical and tangible materially adverse result would include (without limitation) creating a hostile working environment for Harmon.

41. The unlawful actions of Lampman against Harmon were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Harmon's rights as guaranteed by 42 U.S.C. § 1981.

42. Lampman treated Harmon less favorably and more harshly than Harmon's similarly situated and non-complaining coworkers in the terms, conditions, benefits, and privileges of Harmon's employment because of his race and in retaliation for complaining about racial harassment.

43. Lampman desired to inflict severe emotional distress on Harmon and/or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

44. As a direct, foreseeable, and proximate result of Lampman's intentional illegal retaliation, Harmon has suffered injuries, damages, and other losses, without limitation to lost wages and benefits, anxiety, personal indignity, humiliation, embarrassment, and emotional distress. These injuries and damages continue into the present and will continue into the foreseeable future.

45. Harmon requests relief as hereinafter provided.

### THIRD CAUSE OF ACTION: RACE DISCRIMINATION, RACIAL HARRASSMENT, AND RACIALLY HOSTILE WORKPLACE UNDER 42 U.S.C. § 1981 AGAINST BARRICADE FLASHER SERVICE, INC.

46. Harmon incorporates here all previous paragraphs.

47. 42 U.S.C. § 1981 protects Harmon from race discrimination, racial harassment, and a racially hostile workplace.

48. Barricade's decision not to conduct an investigation of Harmon's racial harassment complaint was motivated by Barricade's racial animus.

49. Barricade's decision not to discipline "RJ" for racially harassing Harmon was motivated by Barricade's racial animus.

50. Barricade regularly allows its white employees to refer to African-Americans as "niggers" in the workplace.

51. Barricade allows its white employees to send racist text messages to its African-American employees.

52. Barricade discriminated against Harmon by denying his requests to work on state-related projects that would have paid him prevailing wages.

   a. No similarly situated white or non-complaining employee was denied the opportunity to earn prevailing wages.

53. When Barricade discriminated against Harmon because of his race and retaliated against Harmon because he complained of racial harassment, Barricade knew the immediate, practical and tangible materially adverse result would include (without limitation) creating a hostile working environment for Harmon.

54. The unlawful actions of Barricade against Harmon were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Harmon's rights as guaranteed by 42 U.S.C. § 1981.

55. Barricade treated Harmon less favorably and more harshly than Harmon's similarly situated and non-complaining coworkers in the terms, conditions, benefits, and

privileges of Harmon's employment because of his race and in retaliation for complaining about racial harassment.

56.     Barricade desired to inflict severe emotional distress on Harmon and/or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

57.     As a direct, foreseeable, and proximate result of Barricade's intentional illegal discrimination, Harmon has suffered injuries, damages, and other losses, without limitation to lost wages and benefits, anxiety, personal indignity, humiliation, embarrassment, and emotional distress. These injuries and damages continue into the present and will continue into the foreseeable future.

58.     Harmon requests relief as hereinafter provided.

## FOURTH CAUSE OF ACTION: RETALIATION
## UNDER 42 U.S.C. § 1981 AGAINST BARRICADE FLASHER SERVICE, INC.

59.     Harmon incorporates here all previous paragraphs.

60.     42 U.S.C. § 1981 protects Harmon from retaliation for complaining about race discrimination, racial harassment, a racially hostile workplace, and retaliation.

61.     Harmon engaged in protected activity when he complained about "RJ's" racial harassment.

62.     Barricade retaliated against Harmon for complaining about "RJ's" harassment by:

    a.     Refusing to allow Harmon to work on state-related projects that would have paid him prevailing wages.

        1)     No similarly situated white or non-complaining employee was denied the opportunity to earn prevailing wages.

    b.     Assigning "RJ," Harmon's harasser, to work with Harmon.

       c.      Requiring Harmon to perform work without the help of others.

           1)     No similarly situated white or non-complaining employee was required to perform work without the help of others.

63. There exists a causal connection between Harmon's protected activities and Barricade's materially adverse action without limitation to the temporal proximity between the date when Harmon complained about "RJ's" racial harrassment and the date Barricade began retaliating against Harmon.

64. When Barricade discriminated against Harmon because of his race and retaliated against Harmon because he complained of racial harassment, Barricade knew the immediate, practical and tangible materially adverse result would include (without limitation) creating a hostile working environment for Harmon.

65. The unlawful actions of Barricade against Harmon were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Harmon's rights as guaranteed by 42 U.S.C. § 1981.

66. Barricade treated Harmon less favorably and more harshly than Harmon's similarly situated and non-complaining coworkers in the terms, conditions, benefits, and privileges of Harmon's employment because of his race and in retaliation for complaining about racial harassment.

67. Barricade desired to inflict severe emotional distress on Harmon and/or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

68. As a direct, foreseeable, and proximate result of Barricade's intentional illegal retaliation, Harmon has suffered injuries, damages, and other losses, without limitation to

lost wages and benefits, anxiety, personal indignity, humiliation, embarrassment, and emotional distress. These injuries and damages continue into the present and will continue into the foreseeable future.

69. Harmon requests relief as hereinafter provided.

**FIFTH CAUSE OF ACTION: RACIAL HARRASSMENT UNDER 42 U.S.C. § 1981 AGAINST JOHN DOE**

70. Harmon incorporates here all previous paragraphs.

71. 42 U.S.C. § 1981 protects Harmon from racial harassment in the workplace.

72. "RJ" racially harassed Harmon by frequently referring to African-Americans as "niggers" and by making other racist comments about African-Americans in the workplace and in the presence of Harmon, an African-American.

73. The unlawful actions of "RJ" against Harmon were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Harmon's rights as guaranteed by 42 U.S.C. § 1981.

74. "RJ" desired to inflict severe emotional distress on Harmon and/or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

75. As a direct, foreseeable, and proximate result of "RJ's" intentional illegal discrimination, Harmon has suffered injuries, damages, and other losses, without limitation to anxiety, personal indignity, humiliation, embarrassment, and emotional distress. These injuries and damages continue into the present and will continue into the foreseeable future.

76. Harmon requests relief as hereinafter provided.

## RELIEF REQUESTED

WHEREFORE, Harmon respectfully requests that this honorable Court enter judgment for him on his complaint against defendants, jointly and severally, and provide the following relief:

A.   A declaratory judgment that the actions complained of herein are unlawful and violate 42 U.S.C. § 1981 and 1988;

B.   An order that defendants pay, jointly and severally, all damages Harmon sustained as a result of defendants' illegal conduct, without limitation to compensatory damages for lost wages and benefits, anxiety, emotional distress, humiliation, embarrassment, and mental aguish, together with pre- and post-judgment interest and other statutory penalties, plus punitive damages;

C.   An order that defendants pay, jointly and severally, the costs of this action, including reasonable attorneys' fees and expert fees to extent available under the federal laws; and

D.   Such other and further legal and equitable relief that this honorable Court deems just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Harmon hereby requests a jury trial on all causes of action and claims with respect to which he has a right to a jury trial.

Dated: October 20, 2011.

                        PETERSON, JOHNSON & MURRAY, S.C.
                        Attorneys for Plaintiff Joe Harmon

                        */s/ William F. Sulton*
                        William F. Sulton
                        State Bar No. 1070600
                        733 North Van Buren Street, Floor 6
                        Milwaukee, Wisconsin 53202
                        Telephone: (414) 278-8800
                        Facsimile: (414) 278-0920
                        Email: wsulton@pjmlaw.com